# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

Kenny Faulk,

     Plaintiff,

         Case No. 1:21-cv-1850-MLB

v.

Dimerco Express USA Corp.,

     Defendant.

_____/

## **OPINION & ORDER**

Plaintiff Kenny Faulk sued Defendant Dimerco Express USA, claiming it rescinded a job offer because of his race in violation of 42 U.S.C. § 1981. (Dkt. 10.)  After a four-day trial, a jury returned a verdict for Plaintiff, awarding him $90,000 in lost wages, $150,000 for past emotional distress damages, $150,000 for future emotional distress damages, and $3,000,000 in punitive damages. (Dkt. 160.)  Defendant moves for a new trial or relief from judgment, or alternatively, to reduce the award. (Dkt. 175.)  Plaintiff opposes. (Dkt. 191.)  The Court denies Defendant's motion.

## I.     Discussion

Defendant says it is entitled to a new trial or relief from judgment on liability and damages based on misconduct by Plaintiff's counsel, various evidentiary errors, and cumulative error. (Dkt. 175-1 at 3–24.) Alternatively, it asks the Court to order remittitur and reduce the damages award. (*Id.* at 24–26.)

### A.     New Trial

Pursuant to Federal Rule of Civil Procedure 59(a)(1)(A), a court may grant a new trial "after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court." A party may seek a new trial by arguing that "the verdict is against the weight of the evidence, that the damages are excessive, or that, for other reasons, the trial was not fair to the party moving; and may raise questions of law arising out of alleged substantial errors in admission or rejection of evidence or instructions to the jury." *Montgomery Ward & Co. v. Duncan*, 311 U.S. 243, 251 (1940); *see also Weisgram v. Marley Co.*, 528 U.S. 440, 452 (2000). That said, the remedy of a new trial "is sparingly used." *Johnson v. Spencer Press of Maine, Inc.*, 364 F.3d 368, 375 (1st Cir. 2004) (citation omitted). A district court has broad

discretion in determining whether a new trial is warranted in a particular case. *Hessen for Use and Benefit of Allstate Ins. Co. v. Jaguar Cars, Inc.*, 915 F.2d 641, 644 (11th Cir. 1990) ("Motions for a new trial are within the sound discretion of the district court . . . and [the Eleventh Circuit's] review of a district court's denial of a new trial involves determining whether the trial judge clearly abused his/her discretion.").

### 1. Counsel's Misconduct

Defendant argues it should get a new trial because Plaintiff's counsel "engaged in willful and strategic misconduct at trial from start to finish," thus contaminating the proceedings and gravely impairing the jury's calm and dispassionate consideration of the case. (Dkt. 175-1 at 5.) A party is entitled to a new trial where opposing counsel's misconduct "impaired a substantial right of the objecting party." *Ruiz v. Wing*, 991 F.3d 1130, 1141 (11th Cir. 2021) (quotation marks and citation omitted). "Inappropriate statements made by counsel will not justify a new trial unless the remarks were such as to impair gravely the calm and dispassionate consideration of the case by the jury." *Id.* (quotation marks and citation omitted). The Eleventh Circuit considers "the entire

3

argument, the context of the remarks, the objection raised, and the curative instruction." *Id.* (quotation marks omitted).

The Court first pauses to note that, on the last day of trial, it admonished Plaintiff's counsel for her behavior during trial. (Dkt. 170 at 10–15, 64–89.) The Court was concerned that counsel violated the Court's instructions on many different issues, including the manner counsel responded to objections or the Court's rulings on objections, counsel's efforts to elicit testimony after the Court sustained objections to exclude that testimony, counsel's repeated arguing with the Court (including after the Court left the bench during breaks), counsel's comments or questions in front of the jury, and counsel's disregard for arguments the Court deemed inappropriate. While—as discussed below—the Court does not find counsel's actions (either individually or collectively) warrant a new trial, the Court stands by its discussion about her behavior at trial.

### a. Opening Statements & Closing Arguments

Defendant first argues Plaintiff's counsel made an improper argument during opening statements. (Dkt. 175-1 at 5–6.) In her opening statement, Plaintiff's counsel argued, "[y]ou're also going to hear

from [Plaintiff] about why he brought this case . . . [w]hy he took the torch

from Renee [Howard], who gave up, to be able to hand it over to you.  And

he's going to tell you how hard it is to fight against corporate power."

(Dkt. 167 at 43.)  The Court immediately stated that it was "going to ask

[her] not to argue about passing a torch to the jury.  That's not an

appropriate argument."  (*Id*.)  At the end of her opening statement,

Plaintiff's counsel said, "[l]isten to see if they take any responsibility for

these actions . . . [a]nd what it will take from the eight of you in this box

to make them hear you."  (*Id*. at 47.)  After the jury was excused, the

Court admonished Plaintiff's counsel and specifically instructed her not

to make an argument about Plaintiff passing a torch to the jury:

> You have to be careful when you talk about passing the torch.
> [Plaintiff] is not passing the torch to teammates on the jury.
> [Plaintiff] is presenting his case to an impartial jury, who
> ought to be asked to follow the law impartially.  They are not
> here to send a message or things of that nature.  They are here
> to assess the facts, determine whether there was a violation
> of the law.  And if so, determine what amount of damages need

to be given to compensate, punish, or deter.  But they are not teammates in a relay race to accept a torch from anyone.

(*Id*. at 67–70.)  Plaintiff's counsel acknowledged the Court's instruction that she not repeat any argument about passing a torch during her closing argument.  (*Id*. at 68.)

She did it anyway.  (Dkt. 175-1 at 9–15.)  Plaintiff's counsel argued in rebuttal, "[Plaintiff], he carried the mantle, and he brought it from [Ms. Howard] to him.  And he picked it up.  And he brought it here so that he could come all the way to this courtroom and to bring it and to turn it over to you." (Dkt. 169 at 362.)  Defendant objected, and the Court stated that it was "going to strike that last statement." (*Id*.)  Plaintiff's counsel finished her rebuttal closing argument: "[i]t is up to you to give a verdict in this case.  It is up to you to bring justice in this courtroom, in this country and in this community." (*Id*.)  The Court dismissed the jury, and Defendant asked for a curative instruction based on Plaintiff's counsel's reference to the mantle.  (*Id*. at 366, 369; Dkt. 170 at 16.)  The Court explained that it thought "the jury got from [Defendant's] objection and [the Court's] sustaining the point that [Plaintiff's counsel's argument] wasn't okay.  And [it thought] to do anything more at this point in the case would be improper and could prejudice [] Plaintiff."

(Dkt. 169 at 369–70; *see also id.* at 371.)  The Court made clear, however, that Plaintiff's counsel had "completely violated [its] rule from opening statement," opining that she did so "aggressively and knowingly."  (*Id.* at 370.)

The following day (outside the presence of the jury), the Court explained that, although Defendant had not moved for mistrial, it had considered whether one was warranted because Defendant had again requested a curative instruction based on Plaintiff's counsel's reference to the mantle.  (Dkt. 170 at 10.)  The Court concluded a mistrial was not appropriate.  (*Id.*)  The Court explained that, despite Plaintiff's counsel's inappropriate behavior in ignoring the Court's instructions, it was "confident that this jury ha[d] a fair view of the evidence and ha[d] not been impacted by any of that.  And [it] [did not] think [the jury] was impacted by the one comment."  (*Id.* at 13; *see also id.* at 17.)

Defendant argues Plaintiff's counsel's closing argument directly violated the Court's clear directives and was thus improper.  (Dkt. 175-1 at 12–14.)  It relies on Eleventh Circuit precedent upholding a district court's decision to grant new trial where the court had found that a party had directly violated its rulings and that inappropriate comments likely

had affected the jury's verdict.  (*Id.* at 12–13 (citing *McWhorter v. City of Birmingham*, 906 F.2d 674 (11th Cir. 1990)).)  Defendant contends the comments in this case gravely impaired the jury's calm and dispassionate consideration of the case and that the Court's refusal to give a curative instruction further prejudiced Defendant.  (*Id.* at 13–14.)  Plaintiff contends his lawyer's argument was not improper in substance and does not warrant a new trial.  (Dkt. 191 at 10.)

The Court agrees—as discussed extensively at trial—that Plaintiff's counsel's reference to passing the mantle during closing argument directly violated the Court's order.  (*See, e.g.*, Dkt. 170 at 10–15.)  Whether or not the argument is appropriate (and the Court thinks it is not), the Court clearly instructed counsel that she was not to repeat the argument.  She did so anyway.  Changing the word from "torch" to "mantle" is a meaningless difference that merely emphasized the intentionality of counsel's conduct.  But, as stated during trial, the Court does not agree that her comments had any impact on the jury. *Cf. McWhorter*, 906 F.2d at 677 (finding that the improper arguments also "likely affected the jury's verdict").

Before opening statements, the Court explained to the jury that the lawyers' statements and arguments—including their remarks during opening statements and closing arguments—were not evidence and should not play the role of evidence in their deliberations. (Dkt. 167 at 9.) Following Plaintiff's counsel's comment during opening statements, the Court immediately instructed counsel not to make such an argument. (*Id.* at 43.)   During the Court's final instructions to the jury—before closing arguments—it again reminded the jury, "anything the lawyers say is not evidence and isn't binding on you.  Anything the lawyers said during opening statements, that they said in making objections, or that they will say in their closing arguments are not evidence[] and should not be considered by you as evidence." (Dkt. 169 at 300–01.)  And following Plaintiff's counsel's comment during closing arguments, the Court immediately struck the statement about the "mantle" when Defendant objected.   (*Id.* at 362.)   Given that the Court contemporaneously admonished Plaintiff's counsel and struck her inappropriate comments and twice instructed the jury that the lawyer's comments in this case were not evidence, the Court does not find that her misconduct gravely impaired the jury's dispassionate consideration of the case. *See United*

*States v. Colston*, 4 F.4th 1179, 1192 (11th Cir. 2021) ("[The Eleventh Circuit] always presume[s] that a jury follows its instructions."); *Ruiz*, 991 F.3d at 1141.

### b. Forbidden Trial Tactics

Defendant argues Plaintiff's counsel engaged in forbidden trial tactics by improperly coaching Plaintiff during his cross-examination by standing at counsel's table, making facial expressions at him in the jury's view, and interposing several speaking objections that "either suggested a response to the witness or were unnecessarily disruptive." (Dkt. 175-1 at 6–7.) During Plaintiff's testimony (outside the presence of the jury), the Court instructed Plaintiff's counsel to sit. (Dkt. 169 at 195.) The Court later admonished her for disregarding its instruction and for making faces at Plaintiff: "[a]nd I saw you from time to time smiling at your client, nodding with your client, and making other facial expressions to your client. Perhaps unintentionally. I did not say anything about it, although I think it inappropriate[,] and I think the jury saw it." (Dkt. 170 at 70.) The Court did not say anything about Plaintiff's counsel's facial expressions because Defendant did not object to the conduct at the

time—perhaps because its lead counsel's back was turned, and co-counsel did not notice it. (Dkt. 175-1 at 7.)

Defendant provides no additional legal basis for its "forbidden trial tactics" argument. In any event, as Defendant notes, the Court asked Plaintiff's counsel to sit down. (Dkt. 169 at 195.) And the Court found that Plaintiff's counsel's inappropriate conduct—interrupting and pushing arguments—largely occurred outside the presence of the jury. (Dkt. 170 at 12–13.) As the Court stated during trial, the Court is confident that the jury had a fair view of the evidence and was not impacted by her conduct. (*Id.* at 13); *Ruiz*, 991 F.3d at 1141.

### c. Improper Cross-Examination

Defendant argues Plaintiff's counsel improperly examined Sookie Song, Defendant's corporate representative. (Dkt. 175-1 at 7–9.) Ms. Song testified she made the decision to rescind Plaintiff's employment offer based, in part, on an ADP background check report specifying Plaintiff had a misdemeanor conviction for disorderly conduct. (Dkt. 169 at 255.) During Ms. Song's direct examination (outside the presence of the jury), Plaintiff's counsel objected to Defendant's attempt to introduce a second report containing additional criminal history that

Ms. Song relied on in rescinding Plaintiff's offer.  (*Id.* at 258.)  The Court sustained Plaintiff's objection, finding the second report contained inadmissible information about Plaintiff's criminal history.  At the same time, the Court concluded Ms. Song could testify she considered information (in that report) showing Plaintiff's misdemeanor conviction for disorderly conduct resulted from a plea deal after his arrest for aggravated assault.  (*Id.* at 260–61.)  When the jury returned, Ms. Song—consistent with the Court's instruction—testified she knew Plaintiff's conviction for disorderly conduct arose from an arrest for aggravated assault.  (*Id.* at 265–69.)

During Ms. Song's cross-examination, Plaintiff's counsel asked, "[s]o you, yourself, did not go do additional digging into [Plaintiff's] background[,] right?"  (*Id.* at 276.)  Ms. Song explained that it was not her job to do so.  (*Id.*)  Plaintiff's counsel asked, "[a]nd you have not produced here any place where you're showing that you've gotten another piece of information right, your lawyer hasn't put it in to show that other than the ADP report, that you received something else, correct?"  (*Id.* at 276–77.)  Defendant objected before Ms. Song could answer, arguing

"[i]t has to do with a ruling.  I didn't put it in."  (*Id.* at 277.)  The Court stated:

> [W]e're not going to talk like that in front of the jury.  We're going to remind the jury that the only thing that's in evidence is the evidence.  The other thing I'm going to do is I'm going to sustain the objection for a different reason, in that I don't want you asking a witness to comment on evidence . . . [s]o disregard any summary you heard about what is or is not in evidence.

(*Id.*)

Defendant says Plaintiff's counsel improperly misled the jurors to believe no evidence supported Ms. Song's testimony that she had considered the aggravated assault charge reflected in the second report. (Dkt. 175-1 at 8.)  That was totally unfair.  Plaintiff's counsel had just successfully moved to exclude the second report.  Then she tried to suggest it didn't exist because Defendant had not admitted it.  While Plaintiff's counsel's question was improper—as shown by the Court's sustaining Defendant's objection—Ms. Song did not answer the question, and the Court immediately instructed the jury to "disregard any summary [they] heard about what is or is not in evidence." (Dkt. 169 at 277.)   The Court presumes that the jury followed its instructions. *Colston*, 4 F.4th at 1192.  Defendant says the Court reinforced the

13

inaccurate impression that no other evidence existed.  (Dkt. 175-1 at 9.)
But the Court did not otherwise instruct the jury to disregard Ms. Song's
previous testimony about Plaintiff's arrest for aggravated assault.  That
testimony was essentially unimpeached.  So the Court does not find
Plaintiff's counsel's question gravely impaired the jury's dispassionate
consideration of the case.  *Ruiz*, 991 F.3d at 1141.  Plaintiff's counsel
should not have done what she did, but it did not impact the fairness of
the trial.

In sum, Defendant has failed to establish Plaintiff's counsel's
misconduct warrants a new trial.

## 2. Evidentiary Errors

Defendant says a new trial is warranted because "several
evidentiary errors occurred [during] trial which . . . adversely affected
Defendant's substantial rights as they likely had a substantial influence
on the jury's verdict."  (Dkt. 175-1 at 16.)  Defendant adds that the
resulting verdict was against the great weight of the evidence.  (*Id.*)

When considering evidentiary rulings made by the Court at trial,
the inquiry is whether the exclusion or admission of evidence affected the
moving party's substantial rights.  *Perry v. State Farm Fire & Cas. Co.*,

734 F.2d 1441, 1446 (11th Cir. 1984). "Error in the admission or exclusion of evidence is harmless if it does not affect the substantial rights of the parties." *Id.* The movant bears the burden of showing that impact. *Id.* "To determine if a party's substantial rights were affected, [the court] analyze[s] factors including 'the number of errors, the closeness of the factual disputes, the prejudicial effect of the evidence, the instructions given, and whether counsel intentionally elicited the evidence and focused on it during trial.'" *SEB S.A. v. Sunbeam Corp.*, 148 F. App'x 774, 790 (11th Cir. 2005) (quoting *Ad–Vantage Tel. Directory Consultants, Inc. v. GTE Directories Corp.*, 37 F.3d 1460, 1465 (11th Cir. 1994)) (holding that a party's substantial rights were not affected if "the judgment was not substantially swayed by the error.").[1] The Court may not simply substitute its judgment for that of the jury, and for this reason, a new trial is not appropriate on evidentiary grounds "unless the verdict is against the great—as opposed to greater—weight of the

---

[1] The Court recognizes that *SEB S.A.* and other unpublished cases cited herein are not binding. The Court cites them as instructive nonetheless. *Searcy v. R.J. Reynolds Tobacco Co.*, 902 F.3d 1342, 1355 n.5 (11th Cir. 2018) ("Unpublished cases do not constitute binding authority and may be relied on only to the extent they are persuasive.").

evidence." *Lipphardt v. Durango Steakhouse of Brandon, Inc.*, 267 F.3d 1183, 1186 (11th Cir. 2001).

### a. Exclusion of Plaintiff's Rape/Assault Charges

Defendant argues the Court improperly excluded evidence of Plaintiff's July 2019 arrest for rape, battery (family violence), and aggravated assault (strangulation)—charges that remained pending at the time of the trial in this case.  (Dkt. 175-1 at 16–20.)  Plaintiff argues the Court properly excluded that evidence, as its prejudicial impact greatly outweighed any probative value.  (Dkt. 191 at 14–17.)

In July 2019, Plaintiff worked for another company.  (Dkt. 108 at 5.) Law enforcement arrested him while he was on a business trip, and his employer fired him.  (*Id.* at 6.)  Plaintiff did not tell Defendant about the July 2019 arrest during the application process.  Indeed, Defendant did not know of the charges until it deposed Plaintiff in this case.  (*Id.*; Dkt. 168 at 242.)  Before trial, Plaintiff filed a motion in limine to exclude evidence of these charges as irrelevant and unduly prejudicial.  (Dkts. 97 at 43; 101 at 3-9; 128.)  Defendant said the charges were relevant to Plaintiff's claim for emotional distress damages, as the charges were still pending in April 2021 when he learned about Defendant's discriminatory

actions and allegedly suffered emotional distress. (Dkt. 108 at 7–11.) Defendant thus argued the pending charges were an alternative cause of any emotional distress.

The Court originally ruled the jury could consider whether his July 2019 arrest for rape was the actual (or at least partial) cause of any emotional distress he suffered when he learned of Defendant's alleged misconduct. (Dkt. 136 at 6.) The Court also determined the prejudicial impact of the evidence did not substantially outweigh its probative value for assessing emotional distress. (*Id.*) The Court explained, "[i]ndeed, the nature of the charges has strong probative value, as a jury might well find living with the stigma of rape charges far more stressful than living under the cloud of less reprehensible charges." (*Id.*)

In its order, the Court noted Plaintiff had cited *Barber v. City of Chicago*, 725 F.3d 702 (7th Cir. 2013), to support his argument that the Court should exclude the evidence. (Dkt. 136 at 6–9.) In that case, a plaintiff sued the City of Chicago for (among other things) emotional distress damages, claiming two of its officers used excessive force in falsely arresting him in 2005. The Seventh Circuit concluded the trial court had erred in allowing the defendant to admit evidence of the

plaintiff's unrelated 2010 arrest and conviction to show a supervening

cause of any emotional distress. *Barber*, 725 F.3d at 711.  This Court

distinguished *Barber,* saying:

> On its face, [the *Barber*] conclusion might seem relevant here.
> But the plaintiff in *Barber* did not allege broad emotional
> distress.  He merely alleged he was fearful of the two officers
> because of the way in which they had mistreated him.  He
> explained he was not fearful of all police, just the two officers
> who arrested him in 2005.  As a result of that narrow claim,
> the Court of Appeals concluded evidence of other police
> encounters (not involving those two officers) was irrelevant
> and should not have been admitted. *Id.* at 713.  Interestingly,
> the Court explained that, had plaintiff cast his claim for
> emotional-distress damages more broadly "in the hopes of
> obtaining a larger verdict," the probative value of his prior
> arrest "would have been much greater" in showing an
> alternative cause for emotional distress. *Id.*  "The larger the
> chunk of one's life that is claimed to have been negatively
> impacted by emotional distress, the more important it is to
> explore other events that may have contributed to the
> individual's loss." *Id.*

(Dkt. 136 at 6–7.)  The Court noted that Plaintiff in this case had not

"suggested Plaintiff will somehow limit his claim for emotional distress

as the plaintiff did in *Barber*." (*Id.*)  The Court further explained it would

revisit the issues "if that occurs at trial, such that the trauma of being

arrested for rape and facing charges of rape could not be an alternative

cause of Plaintiff's alleged emotional distress." (*Id.*)

At trial, the Court found Plaintiff limited his claim for emotional distress just as the plaintiff in *Barber* had done.  Plaintiff testified that Ms. Howard's message—that Defendant had rescinded the job offer because he is black—made him feel "a little sad," "upset," "angry," and "hurt."  (Dkts. 168 at 200; 169 at 52.)  He explained he originally thought "okay, just disorderly conduct . . . okay, whatever," but later realized Defendant knew all along it was not going to hire him and wasted his time.  (Dkt. 169 at 52.)  He explained it was "discouraging" because it made him think "well, what did I spend all of those years going to college for, [] getting my bachelor's and my master's for what?  And I can't even get this position because [they]'ve already got [their] mind made up.  (*Id.* at 52–53.)  He explained that Ms. Howard had told him that he "had all the credentials" and that "there wasn't a better candidate out there."  (*Id.* at 56.)  He reiterated that Ms. Howard's messages made him upset and angry, but he went back to his father's teachings to "just calm down" and not treat others that way.  (*Id.* at 56–57.)  Plaintiff testified that he realized that it was messed up but that he "went . . . a different way." (*Id.* at 57.)

Plaintiff's counsel asked Plaintiff if he had been discriminated against before, Defendant objected, and the Court sustained the objection. (*Id.* at 59.)  Plaintiff's counsel then asked, "[o]n a scale of one to ten, with one being the least and ten being the worst discrimination that you've been through, what does what happened here rate?" (*Id.*)  Defendant objected, and the Court sustained the objection. (*Id.*)  Plaintiff's counsel asked, "[h]ow bad was this discrimination for you?  How bad did it make you feel?" (*Id.*)  Plaintiff said, "I mean . . . **this was like the worst thing**.  I mean, this is – it's – it's just – it's just bad.  Because, I mean, I've tried, I've worked so hard in my life.  I've worked so hard for this opportunity[] [a]nd [] put in all the work . . . ." (*Id.* at 59–60 (emphasis added).)   Plaintiff's counsel asked why Plaintiff had brought this lawsuit, and Plaintiff explained:

> Well, because, I mean, I was discriminated in just, to me, it was one of the worst ways possible.  And to not – to give me one reason and then it's a hiding everything, covering up.  And then I find out later that it was just due to the color of my skin.  And there needs to be – and it wasn't just me.  There's – it's systematic within this company . . . But it's just been – it's just been the hardest – **I mean, it's been the hardest thing for me**.  And it has to change within this company.  Something has to change, because – and as far as I know right now, there's – nothing's changed.

(*Id.* at 76–77 (emphasis added).)

On a break during Plaintiff's cross-examination, the Court explained:

> I think he has limited his claim of emotional distress to a – fairly clearly to a timeframe that began when he had a pretty clarifying moment that he had been what he believed discriminated against. And I think that he's done a job of explaining really his emotional distress tied to a feeling of discrimination. And I think that in that regard, I think it is – he hasn't – he hasn't described any greater general malaise or angst or emotional pain that could be attributed to the rape allegation. Does that – so I think I'm at the point where having heard, I think [] [P]laintiff has cuddled up within *Barber* very safely. And that's going to be what I'm going to follow.

(Dkt. 169-2 at 94.) Defendant argued it should be allowed to bring in "coterminant stressors," arguing that Plaintiff had mentioned George Floyd, his mother's health issues, and his father's death. (Dkt. 169 at 94–95.) The Court explained that it had stopped a lot of that testimony. It also explained how Plaintiff had limited his testimony to his distress from learning Defendant had not hired him because he is black:

> I think he has defined or explained both in his testimony and in the evidence of the texts a clarion call that hit him at a moment about having been mistreated. And he has identified any mental anguish very narrowly within that area. He hasn't said, for example, I couldn't get out of bed. I couldn't function. I was depressed. I didn't want to go out and find another job. I didn't want to go out to the workforce and try

to get something at that level for fear that I would be discriminated against.  He hasn't said any of that. . . . So he hasn't really brought in sort of a more general malaise to – and I've been listening the whole time.  We've all known this was coming.   I was on your side when we were talking generically.  I stayed on your side when I read *Barber*.  But I've been drawing the line.  And that clarion call of that text, in April of 2021, after the July of 2019 – that's almost two years later, that was very focused.  And I think to the extent that there is going to be emotional distress argument, I think it's going to be along the lines of racial – how it made him feel as a man who had been maybe mistreated because of the color of his skin.

(*Id.* at 95–96.)  Defendant argued that *Barber* did not allow the Court to "completely eliminate a coterminant stressor" that goes to emotional distress.  (*Id.* at 98.)   After some back and forth about the meaning of *Barber*, the Court explained that, like the plaintiff in *Barber*, Plaintiff had not claimed disabling long-term trauma.  (*Id.* at 100.)  The Court stated:

Had [Plaintiff's] claim for emotional distress damages been cast in such a broad manner in hopes of obtaining a larger verdict, then the probative value of the intervening conviction and resulting incarceration would have been much greater.  The larger chunk of one's life that is claimed to have been negatively impacted by emotional distress, the more important it is to explore other events that may have contributed to the individual's loss.  And here, we have maybe some relevance, but he has been very, very narrow, not just in like saying when it began.  And maybe you don't really believe that.  Maybe you can say you're just saying that to fit into the *Barber* case.  But he has also described the impact in a very

22

> narrow way.  A very narrow impact.  And because of that, it
> has much less relevance.  And so then we look at any type of
> prejudice versus probative value of it.  And in that instance,
> the probative value of a rape [] arrest and accusation becomes
> much greater than any limited probative value.

(*Id.* at 101.)  Defendant reiterated its position.  (*Id.* at 103–04.)  The Court

explained that it understood Defendant's argument but was going to

exclude the evidence under Rule 403:

> It is my judgment, having heard the evidence, it is my
> judgment that having considered *Barber*, that when I do right
> now, where we were in the evidence, that the way I weigh it
> is that the prejudice outweighs the probative nature.  And I'm
> going to exclude a discussion of an arrest at the time given the
> clarion text that was received.

(*Id.* at 105–07.)

During Plaintiff's cross-examination, he reiterated that finding out

Defendant rescinded his offer because of the color of his skin was "really

upsetting" because he felt like he was the candidate for that position.  (*Id.*

at 167.)  The jury took a break, and Defendant restated its position.  (*Id.*

at 186.)  The Court disagreed, explaining:

> [Plaintiff] has been adamant that his frustration here, to the
> extent you've touched on it at all, which is very little, is the
> assessment or evaluation of him based upon his race.  And he
> has been linear and vehement in that.  And I haven't heard
> anything that changes my mind in that regard.

(*Id.*)  The Court reiterated that Plaintiff had not described a general malaise or inability to function, so Plaintiff would only be able to argue about the impact Defendant's actions had on him "in feeling victimized because of his skin color."[2]  (*Id.* at 188.)

Defendant says the Court erred in excluding evidence of Plaintiff's charges because they were pending during the entire period for which Plaintiff testified he suffered emotional damages.  (Dkt. 175-1 at 18–19.)  As noted, the Court discussed this issue extensively at trial.  While there may have been some connection between the pending charges against Plaintiff and his claim for emotional distress, that connection was tenuous.   Plaintiff kept his testimony limited to how Ms. Howard's message notifying him of Defendant's actions made him feel—sad, angry, and upset.  And Plaintiff explained why—Defendant told him that they rescinded his offer for one reason (his disorderly conduct conviction) only to later learn that it rescinded his offer because of the color of his skin.  He explained that this was discouraging because of the time he spent

---

[2] Defendant asked if it could examine Plaintiff outside of the presence of the jury to see what his testimony would be as to whether the charges were a stressor.  (Dkt. 169 at 191.)  Plaintiff pled the fifth to every question on the matter.  (*Id.* at 199–202.)

building his education.  He—like the plaintiff in *Barber*—"did not claim a generally disabling long-term trauma."  *Barber*, 725 F.3d at 713.  He did not describe a broader feeling of malaise or depression, nor did he claim that his emotional trauma prevents him, for example, from fulfilling any future dreams or applying to other jobs.  His demeanor did not suggest that he experienced such emotions.  Moreover, Plaintiff's counsel reiterated during her closing argument that, although Plaintiff had talked about other things in his life that bothered him, Plaintiff was only asking the jury to compensate him for "what happened here." (Dkt. 169 at 332.)  Put simply, Plaintiff's claim for emotional distress damages was limited to the anger and sadness he experienced from Defendant's assessment of him based on his race.

Defendant says it should have been able to develop all factual elements that related to damages.  (Dkt. 175-1 at 18 (citing *Bryan v. Jones*, 519 F.2d 44, 46 (5th Cir. 1975), *rev'd and remanded on another issue*, 530 F.2d 1210 (5th Cir. 1976) (en banc)).)  In *Bryan*, the Court concluded a district court erred in refusing to permit proof of the plaintiff's prior imprisonment relative to the damages he claimed for false imprisonment.  *Id.*  Defendant misses the point.  Unlike here,

evidence of the plaintiff's prior arrest in *Bryan* was highly relevant to his emotional damages claim for false imprisonment, as "mental anguish may be much less for the recidivist than for one incarcerated for the first time." As noted above, the connection between Plaintiff's pending charges and his claim for emotional distress was far more tenuous given Plaintiff's testimony.

The Court finds (as it did during trial) that the risk of unfair prejudice substantially outweighed the minimal probative value of the pending charges on the issue. Unfair prejudice is often embodied by "an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." *Old Chief v. United States*, 519 U.S. 172, 180 (1997) (quotation marks and citations omitted). Presenting evidence that Plaintiff faced charges for rape, battery, and aggravated assault (for strangulation) to the jury presented a substantial risk that the jury would render a verdict based on emotion or outrage rather than the evidence in this case. And, again, the evidence had minimal probative value given Plaintiff's testimony tying his emotional distress to a specific action that involved a very different event (discrimination).

Defendant says Plaintiff's testimony was not limited like the plaintiff in *Barber*. (Dkt. 175-1 at 19–20.) It argues that, because it was not able to address the crucial fact that Plaintiff was facing serious felony charges at this same time, the jury was left with the impression that the worst thing for Plaintiff in April 2021 was Defendant's motivation for its employment decision, not the pending charges. (*Id.* at 19.) Defendant says the jury was also left with the false impression that Plaintiff suffered emotionally in 2021 solely because Defendant sabotaged his career, when Plaintiff knew that the pending charges would present a far greater obstacle to his career. (*Id.* at 19–20.) To support its contentions, Defendant points to Plaintiff's testimony that this discrimination was "like the worst thing" and that "it's been the hardest thing for [him]." (*Id.* at 19.)

As an initial matter, Defendant did not make any arguments based on these two comments during trial. While it argued extensively about coterminant stressors, it never argued that it should be able to impeach Plaintiff based on these statements. Absent an objection, the court will review for plain error but "a finding of plain error is seldom justified in reviewing argument of counsel in a civil case." *Oxford Furniture*

27

*Companies, Inc. v. Drexel Heritage Furnishings, Inc.*, 984 F.2d 1118, 1128 (11th Cir. 1993).   "Plain error is clear or obvious and affects those substantial rights that call into question the fairness, integrity, or public reputation of judicial proceedings." *Sec. & Exch. Comm'n v. Complete Bus. Sols. Grp., Inc.*, 608 F. Supp. 3d 1231, 1249 (S.D. Fla. 2022) (internal quotation marks omitted).   A court may order new trial, where an improper argument was made without objection, when the interests of substantial justice are at stake. *McWhorter*, 906 F.2d at 677.

The Court first notes the context in which Plaintiff made these comments.   Plaintiff's first comment—that this discrimination was "like the worst thing"—came after Plaintiff's counsel asked how bad this discrimination compared to others he had experienced on a scale of one to ten, Defendant objected, and the Court sustained the objection.   She then asked how bad this discrimination was for him.   Plaintiff's answer referred back to the scale Plaintiff's counsel referenced, despite the Court's sustaining the objection.   And Plaintiff's second comment—that "it's been the hardest thing for me"—came after rambling in an answer to why he had brought this lawsuit.   Plaintiff's answers merely were hyperbolic.   As the Court noted during trial, it listened intently to

28

Plaintiff's testimony surrounding this issue. Neither statement suggested that this discrimination was the worst thing that had ever happened to him in his life, nor did his demeanor suggest as such. So Plaintiff did not, as Defendant suggests, open the door to impeach him on the issue. The Court sees no clear or obvious error in excluding evidence of Plaintiff's pending charges based on these two hyperbolic, brief comments. *Sec. & Exch. Comm'n*, 608 F. Supp. 3d at 1249.

### b. Plaintiff's Testimony on Recovery

Defendant argues the Court improperly admitted Plaintiff's testimony about his intentions for any money he recovered. (Dkt. 175-1 at 20–21.) Plaintiff responds that the Court stopped Plaintiff's testimony and issued a curative instruction. (Dkt. 191 at 17.)

During Plaintiff's direct examination, Plaintiff's counsel asked Plaintiff, "if the jury returns a verdict for a full and just amount, what would you do next?" (Dkt. 169 at 78.) Defendant objected, and the Court sustained the objection. (*Id.*) Plaintiff's counsel asked Plaintiff what his future plans were, and Plaintiff responded that he would help his mother who had cancer. (*Id.* at 78–79.) The Court immediately struck that testimony and asked Plaintiff to move on. (*Id.* at 79.) Plaintiff's counsel

asked what Plaintiff would do with his career. (*Id.*) Plaintiff explained that he wanted to "get back into working with [] less fortunate kids." (*Id.* at 80.) The Court explained to the jury that it would instruct them on the basis to decide whether to award damages. (*Id.*) The Court explained:

> I will not tell you that you can in any way consider what the plaintiff would do with money as any part of [their] decision. . . . So I'm giving you that very careful instruction. So I am going to strike, to the extent any of this testimony suggests what he would do with money, I'm striking that, if he were to recover any money.

(*Id.* at 80–81.) Plaintiff's counsel then asked Plaintiff about his employment goals going forward, and Plaintiff explained that he wanted to help troubled kids. (*Id.* at 82–83.)

Plaintiff's counsel should not have elicited this testimony, particularly not when the Court clearly sustained objections to it. How Plaintiff would use any money he recovered was not relevant to any issue before the jury and should not have been explored. Nevertheless, the Court concludes Plaintiff's comments did not affect Defendant's substantial rights. *Perry*, 734 F.2d at 1446. The Court immediately struck Plaintiff's testimony about what he intended to do with any money he might recover and instructed the jury that such intentions were not

30

part of its consideration.  *SEB S.A*, 148 F. App'x at 790.  Indeed, the Court provided that instruction without Defendant even asking for it. Defendant says the Court's curative instruction did not stop the jurors from considering Plaintiff's testimony, as shown by their question during deliberations. (Dkt. 175-1 at 21.)  During deliberations, the jury sent a question: "If awarded punitive damages, [h]ow is it dis[b]ursed?" (Dkts. 170 at 89; 154-2.)  The Court explained to the jury that, if it awarded punitive damages, how damages were disbursed was not for the jury's consideration.  (Dkt. 170 at 95.)  The Court is not convinced that the jury's question necessarily meant that it improperly considered Plaintiff's testimony about what he intended to do with any potential recovery.  Nothing on the face of that question suggests that was what the jury wanted to understand.  They might have been inquiring as to whether such damages would be paid to the state.  In any event, the Court instructed the jury that disbursement was not part of its consideration.  The Court presumes that the jury followed that instruction.  *Colston*, 4 F.4th at 1192.

### c. **Plaintiff's Testimony on Civil Rights Leaders**

Defendant argues the Court improperly admitted Plaintiff's testimony about the civil rights movement and Black Lives Matter.[3] (Dkt. 175-1 at 21–22.)   Plaintiff responds that the Court stopped Plaintiff's testimony.  (Dkt. 191 at 17.)

Plaintiff's counsel asked Plaintiff why he brought this lawsuit, and Defendant objected.  (Dkt. 169 at 68.)  The Court overruled the objection. (*Id.*)  Plaintiff testified, "I mean, I look at all the people that came before me.  And I know this about just your civil liberties, your civil rights, you know, all the people before, as I talked about who -- who fought, people like Martin Luther King."  (*Id.* at 69.)  Right after Plaintiff's answer, the

---

[3] As part of this, Defendant says the Court erred in admitting testimony about George Floyd.  (Dkt. 175-1 at 21.)  Notably, Defendant does not cite any portion of the trial transcript in this regard.  In any event, Defendant did not object to Plaintiff's testimony about George Floyd as prejudicial; it only objected to Plaintiff's counsel's question on the basis that counsel was testifying.  (Dkt. 169 at 50–51); *Wallace v. Mangiaracina*, 745 F. App'x 356, 359 (11th Cir. 2018) ("[Counsel's] failure to object to the statements either during closing argument or right after argument ended undermines any claim that those statements were so prejudicial as to warrant a new trial.").  So the Court reviews this argument for plain error.  *Oxford Furniture Companies, Inc.*, 984 F.2d at 1128.   Given Defendant's lack of objection and questions on the same topic during Plaintiff's cross-examination, however, it simply has not met this high burden.  (*See, e.g.*, Dkt. 169 at 155, 173–80.)

Court sustained Defendant's objection because Plaintiff's testimony was irrelevant. (*Id.*) Defendant did not request a curative instruction. (*See id.*) Outside of the presence of the jury, the Court explained to Plaintiff's counsel why it had sustained the objection. (*Id.* at 69–75.) When the jury returned, Plaintiff's counsel again asked Plaintiff why he brought this lawsuit, and Plaintiff replied, "[w]ell, because, I mean, I was discriminated in . . . one of the worst ways possible." (*Id.* at 76.)

The Court concludes Plaintiff's comments did not affect Defendant's substantial rights. *Perry*, 734 F.2d at 1446. The Court immediately sustained Defendant's objection following Plaintiff's answer, Defendant did not request a curative instruction, and Plaintiff's counsel quickly moved on to why Plaintiff brought the lawsuit *personally* rather than for some broader, societal purpose. *SEB S.A*, 148 F. App'x at 790.

In conclusion, Defendant has failed to establish that the Court erred in its evidentiary rulings or that any evidentiary error, if committed, was so prejudicial as to affect its substantial rights.[4]

---

[4] Defendant alternatively moves for relief from judgment under Federal Rule of Civil Procedure 60. (Dkt. 175-1 at 23–24.) For the same reasons noted above, the Court denies Defendant's motion under Rule 60.

## 2. Cumulative Error

Defendant argues that, even if none of the above errors are sufficient on their own, the cumulative effect of these errors inflamed the jury and denied Defendant its constitutional right to a fair trial. (Dkt. 175-1 at 23.)  "The cumulative error doctrine provides that an aggregation of non-reversible errors (i.e., plain errors failing to necessitate reversal and harmless errors)" can be grounds for a new trial. *Morris v. Sec'y Dep't of Corr.*, 677 F.3d 1117, 1132 (11th Cir. 2012) (citation omitted).  The Court has found no error based on the grounds asserted by Defendant.  Therefore, Defendant's argument of cumulative error is inapplicable.

## B.   Remittitur

Defendant alternatively asks that the Court order remittitur and reduce the jury's damages award because the award was "excessive, has no evidentiary foundation, and violates due process."  (Dkt. 175-1 at 24–26.)

"A traditional request for a remittitur . . . is governed by Rule 59." *Goodloe v. Royal Caribbean Cruises, Ltd.*, 418 F. Supp. 3d 1112, 1130 (S.D. Fla. Oct. 1, 2019) (citing *Johansen v. Combustion Eng'g, Inc.*, 170

F.3d 1320, 1331 (11th Cir. 1999)).  "A remittitur is a substitution of the court's judgment for that of the jury regarding the appropriate award of damages.  The court orders a remittitur when it believes the jury's award is *unreasonable* on the facts." *Johansen*, 170 F.3d at 1331 (emphasis in original).  A remittitur is "the appropriate remedy where the jury's damage award exceeds the amount established by the evidence." *Goldstein v. Manhattan Indus., Inc.*, 758 F.2d 1435, 1448 (11th Cir. 1985).  It is a discretionary judicial act that implicates the Seventh Amendment's prohibition on the "re-examination of a jury's determination of the facts, which includes its assessment of the extent of plaintiff's injury." *Johansen*, 170 F.3d at 1328.  A court may enter a remittitur only with a plaintiff's consent. *Id.* at 1329.  "If the plaintiff does not consent to the remittitur, the court has no alternative but to order a new trial." *Id.*

## 1. Compensatory Damages

Defendant says Plaintiff's testimony does not support the jury's award of $300,000 for emotional distress, noting that Plaintiff testified he was angry and sad and that learning of Defendant's discrimination

against him was the hardest and worst thing.[5]  (Dkt. 175-1 at 25.) Defendant says the Court should reduce the award to $90,000—the amount of lost wages.  (Dkt. 203 at 13.)

The standard of review for compensatory damages awards for intangible, emotional harm is "deferential to the fact finder because the harm is subjective and evaluating it depends considerably on the demeanor of the witnesses." *Ferrill v. Parker Group, Inc.*, 168 F.3d 468, 476 (11th Cir. 1999).  General compensatory damages, as opposed to special damages, need not be proved with a high degree of specificity and may be inferred from the circumstances or proven through testimony.  *Id.* A plaintiff thus may be compensated for intangible, psychological injuries—including for suffering embarrassment and humiliation.  *See Marable v. Walker*, 704 F.2d 1219, 1220–21 (11th Cir.1983) (plaintiff's testimony of embarrassment and humiliation sufficient to support compensatory damages award).  To assess compensatory damages awards, courts consider the size of the award, the rational relationship between the award and the evidence adduced at trial, and awards in

---

[5] Defendant does not challenge the jury's $90,000 award for lost wages.

similar cases. *Copley v. BAX Glob., Inc.*, 97 F. Supp. 2d 1164, 1172 (S.D. Fla. 2000).

As detailed above, Plaintiff provided specific testimony about the emotional damage he suffered because of Defendant's actions. He testified Defendant's discrimination against him and lies about why it had rescinded the job offer made him sad, angry, and upset. He testified he felt discouraged and as though he had wasted his time and money getting a college and master's degree only to not get the position because of his race, especially given that Ms. Howard had told him that there wasn't a better candidate out there. The Court observed Plaintiff throughout trial and particularly while he testified. Plaintiff's demeanor conveyed the embarrassment and pain he experienced because of Defendant's actions. The Court has difficulty adequately describing his demeanor other than to say Plaintiff's body language, tone of voice, and overall appearance while testifying about how he felt when he learned he had been denied employment because he is black evidenced profound sadness, anguish, and humiliation. The Court finds Plaintiff's testimony recounting Defendant's conduct and his resultant emotional suffering was sufficient to support the jury's award of emotional distress damages.

Defendant also argues the award here was grossly excessive. (Dkt. 203 at 11–13.)  The Court is not so convinced.  Defendant cites several decades-old cases or cases that do not involve race discrimination. (*See* Dkts. 175-1 at 25; 203 at 11–13.)  Defendant, for example, cites *Copley*, a case from two decades ago dealing with national origin discrimination, where the district court remitted compensatory damages from $480,000 to $100,000 (roughly $877,000 and $183,000 today when adjusting for inflation, respectively). 97 F. Supp. 2d at 1172.  The district court noted, however, that $150,000 (roughly $274,000 today when adjusting for inflation) "may be viewed as a benchmark figure for compensatory damages in employment cases." *Id.*

Plaintiff's award—$300,000—falls close to this benchmark.  Indeed, Plaintiff, relying on the Eleventh Circuit's decision in *Bogle v. McClure*, 332 F.3d 1347 (11th Cir. 2003), says the emotional distress damages award was well within the bounds of what the jury could award. (Dkt. 191 at 23.)  In that case, several librarians sued the public library system for racial discrimination.  The jury awarded each librarian $1 million for emotional harm. 332 F.3d at 1359.  The Eleventh Circuit affirmed the district court's reduction of those awards to $500,000 per

plaintiff (roughly $850,000 today when adjusting for inflation).  *Id.*  While the Court agrees with Defendant that *Bogle* is distinguishable because it involved evidence of a broader impact of race discrimination on the plaintiffs' lives, the award here falls well below the *Bogle* award and comfortably within the range of these two cases under the facts here. Giving deference to the jury's determination, Plaintiff's testimony, and awards in comparable cases, the Court concludes the jury's award to Plaintiff for emotional distress damages is not excessive so as to require reduction.

## 2.  Punitive Damages

Defendant says the Court should remit the punitive damages award because the jury's finding of malice or reckless indifference was infected by Plaintiff's counsel's improper conduct and wrongly admitted evidence.  (Dkt. 175-1 at 25.)[6]  Defendant also argues the award is

---

[6] Two threshold issues regarding this argument.  First, at a hearing on May 9, 2024, the Court explained Defendant's due process challenge to the punitive damages award is governed by Federal Rule of Civil Procedure 50, "not Rule 59" and "is not really a remittitur at all." *Johansen*, 170 F.3d at 1331.  If a court determines that a "portion of a verdict is for an identifiable amount that is not permitted by law," it may, pursuant to Rule 50, "simply modify the jury's verdict to that extent and enter judgment for the correct amount."  *Id.* at 1330.  "[T]he power to do

constitutionally excessive because the ratio between punitive damages and compensatory damages approaches double digits and additional factors, such as physical harm or financial vulnerability, cannot justify it. (*Id.* at 25–26.)  Plaintiff responds that he presented extensive evidence to support the jury's finding of malice or reckless indifference and the jury's award complied with due process.  (Dkt. 191 at 24–26.)

"Compensatory damages are intended to redress the concrete loss that the plaintiff has suffered by reason of the defendant's wrongful conduct," while "punitive damages serve a broader function; they are aimed at deterrence and retribution."  *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 416 (2003) (quotation marks omitted). "[B]ecause a punitive damages award is an exercise of government power, it must comport with constitutional due process."  *Cote v. Philip Morris USA, Inc.*, 985 F.3d 840, 846 (11th Cir. 2021).   "[G]rossly excessive"

---

so is located in the court's authority to enter judgment as a matter of law" under Rule 50.  *Id.*  So Defendant's due process challenge falls under Rule 50.  Second, as noted above, the Court does not agree that the jury's finding was infected with improper conduct and evidence.  To the extent Defendant argues that the evidence does not support the punitive damages award, Defendant dedicates no analysis to the issue, and the Court disagrees based on the same facts noted above and in its due process analysis below.

punitive damages awards therefore violate a defendant's due process rights. *BMW of N. America, Inc. v. Gore*, 517 U.S. 559, 562 (1996). "[I]n *Gore*, [the Supreme Court] instructed courts reviewing punitive damages to consider three guideposts: (1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases." *State Farm*, 538 U.S. at 418 (citing *Gore*, 517 U.S. at 575); *Cote*, 985 F.3d at 847.

### a. Reprehensibility

Reprehensibility is generally "[t]he dominant consideration in the evaluation of a punitive damages award[.]" *Goldsmith v. Bagby Elevator Co., Inc.*, 513 F.3d 1261, 1283 (11th Cir. 2008). To determine the reprehensibility of a defendant's conduct, a court must consider the following factors: "(1) whether the harm caused was physical as opposed to economic; (2) whether the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; (3) whether the target of the conduct was financially vulnerable; (4) whether the conduct

41

involved repeated actions or was an isolated incident; and (5) whether the harm was the result of intentional malice, trickery, or deceit, or mere accident." *Id.* "There is no requirement that a certain number of the factors be present, but reprehensibility grows more likely as more factors are present." *Cote*, 985 F.3d at 847 (internal quotations omitted).

As applied here, the first factor favors Plaintiff because, as discussed above, he suffered emotional harm. *See Goldsmith*, 513 F.3d at 1283 (finding that the plaintiff's economic and emotional harm suggested that the defendant's misconduct was reprehensible); *see also Williams v. First Advantage LNS Screening Sols. Inc*, 947 F.3d 735, 751–52 (11th Cir. 2020) (noting Eleventh Circuit has at least twice upheld "substantial punitive damages awards when the underlying compensatory damages award was based either entirely or substantially on the plaintiff's emotional distress.").

The second factor favors Defendant, as its conduct did not involve a threat to the health or safety of others.  Plaintiff says Defendant jeopardized Plaintiff's safety by denying him a job opportunity because employment is critical to survival.  (Dkt. 218-1 at 11.)  But no evidence suggests the denial of this job threatened Plaintiff's survival.  Hyperbole.

The Eleventh Circuit, also, has expressly rejected this argument. *See Williams*, 947 F.3d at 751–52 (finding that the district court erred in characterizing this factor as having been met where the defendant's conduct put the plaintiff's "livelihood at stake"). In doing so, the Eleventh Circuit explained that this factor "focus[es] on something larger than whether the reckless conduct might impact a particular person's ability to obtain a particular job." *Id.* at 752; *see also id.* ("[T]o the extent that one can typically expect the loss of a job opportunity to negatively impact a person's financial status, that factor is accounted for in the third factor, discussed below. Similarly, to the extent the loss of a job opportunity might impact one's health, that is accounted for in the first factor[.]").

The third factor—financial vulnerability—likely weighs in Plaintiff's favor, albeit slightly. Plaintiff says he meets this factor because he experienced "sporadic employment and income" after Defendant rescinded his job offer. (Dkt. 218-1 at 12.) Shortly after Defendant rescinded Plaintiff's offer, however, he got a job at Scanwell making $60,000 or $65,000. (Dkt. 168 at 176; *see also* Dkt. 169 at 50 ("I got the position at Scanwell really close after that").) In other words, contrary to Plaintiff's assertion in his briefing, there is no indication from

the record he was unable "to pay for basic necessities" because Defendant discriminated against him. *Williams*, 947 F.3d at 753. Nevertheless, "a determination of financial vulnerability cannot occur in isolation from a plaintiff's relation to a particular defendant." *Flying Fish Bikes, Inc. v. Giant Bicycle, Inc.*, 181 F. Supp. 3d 957, 976 (M.D. Fla. 2016). Although Plaintiff may not have been financially vulnerable, he was vulnerable because he was susceptible to the "particular tactic deployed by" Defendant. *Id.*; *see also Sepulveda v. Burnside*, 432 F. App'x 860, 865 (11th Cir.2011) ("[A]lthough [the plaintiff] was not financially vulnerable, he was vulnerable [because] he relied on [the correctional center's] policies to protect him from other inmates."). Plaintiff simply had to rely upon Defendant's explanation for taking the job away and had no way of knowing Defendant's real motivations. Indeed, had it not been for Ms. Howard, he probably never would have known of his mistreatment. In this way, Plaintiff was vulnerable to Defendant's ability to take advantage of him without his knowledge.

The final two reprehensibility factors certainly favor Plaintiff. Defendant's conduct involved repeated actions by individuals high up in the company. Ms. Howard testified that she approached Herbert Liou

(one of Defendant's presidents) and asked why he had hired a white man, Tanner Thibodeaux, rather than Plaintiff, when Mr. Thibodeaux had more significant criminal history. (Dkt. 109-1 at 19–20.)[7] She stated that "Mr. Liou explained [] that he only wanted to hire whites" and that "whites could [] get in the door with customers while minorities could not." (*Id.* at 20.)  Mr. Liou's unequivocal, stated intention to favor white applicants over black applicants demonstrates Defendant's misconduct against Plaintiff was neither isolated nor accidental but rather systematic and intentional.

Other evidence drives this point home.  Ms. Howard testified Mr. Liou's discriminatory actions were not confined to Plaintiff.  She testified Mr. Liou rejected "any candidates" she sent him who were not white and that "many were rejected simply because of their race and ethnicity." (*Id.* at 14.)  She stated that Mr. Liou explained that it was "easier to get a Caucasian person through the door to obtain sales and [] build business than it was any other race." (*Id.* at 15.)  In January 2020

---

[7] Various portions of depositions were read at trial but not dictated in the trial transcripts.  Defendant does not contest Plaintiff's citations to these depositions, so to Court assumes these portions actually were presented at trial.

(roughly four months after Defendant rescinded Plaintiff's offer), Ms. Howard e-mailed Mr. Liou to explain that she was having trouble finding candidates that fit his demands for race and age. (Dkt. 164-6 at 1.) She explained that the people in the Atlanta office were "open to hiring a diverse candidate," but he had set "criteria" that "restricted" her ability to hire that position. (*Id.*) Again, she was referring to his demand for young, white salespeople. As part of this, she explained "it's discriminating to search for candidates based on race and age." (*Id.*)

Mr. Liou drafted a response that he first sent to Cathy Chou (Defendant's Global Legal Compliance Director) for her review and comment. (Dkt. 164-26 at 1.) He explained that he had hired people of different races for different (non-sales) positions but that "[t]o ensure in hiring appropriate Sales in organization, I would like you to understand the Character of Sales to fit our Biz: a) [Defendant] is focusing on Caucasian Market b) We need young person to be Sales and mature People to be Sales Management." (*Id.*) Ms. Chou understood the wrongfulness and illegality of Mr. Liou's conduct and provided him another warning, saying "[i]f we put[] in writing that you want a specific race and age, [b]oth you and the company are guilty of discrimination and

46

if we ever get a legal complaint, these emails will result in a guilty verdict and large damage award.   It is strongly suggested to reword the message." (*Id.*)  It is worth noting that Ms. Chou did not seek to prevent Mr. Liou's clearly discriminatory practice but rather to "rewrite" the message so Mr. Liou's intention was not so clearly on display.

Other evidence showed that Mr. Liou planned to hire white salespeople.  Plaintiff, for example, introduced a March 2018 e-mail chain between Mr. Liou and Paul Chien (Defendant's Founder and President) containing the subject line: "Plan of Managing DIMUS – 2nd Revision." (Dkt. 164-38 at 1.)   The plan included, "Hiring Caucasian Sales & Marketing Manager/VP in LAX/NY respectively[,]" and "Continue Pairing Concept by leveraging Caucasian Sales & Marketing Manager/VP and Ted to assist local office closing sizable A/C." (*Id.*) Plaintiff also introduced a PowerPoint presentation that Ms. Howard prepared for an October 2019 Management Meeting.  (Dkts. 109-1 at 27; 164-5 at 1.)  The presentation specified that the "Ideal Sales Candidate" was "American and Caucasian (preferred) ethnicity." (*Id.*)  All of this evidence showed that Defendant engaged in a concerted effort to hire white people despite Ms. Howard's and others repeated admonitions and

Ms. Chou's warning that doing would make the company "guilty of discrimination." Evidence Defendant concealed its discrimination from Plaintiff, engaged in discriminatory conduct over a long period of time, and ignored repeated warnings at a high level about the wrongfulness of its actions shows Defendant's actions against Plaintiff were part of repeated conduct (rather than an isolated incident) and the product of malice and deceit (rather than mistake or accident). And, of course, the jury specifically found Defendant "acted with either malice or with reckless indifference towards [Plaintiff]." (Dkt. 169 at 310.) The Court thus concludes that Defendant's conduct involved "repeated actions," malice, and "deceit." *Goldsmith*, 513 F.3d at 1182–8

In sum, four of the five *Gore* factors weigh in Plaintiff's favor and one factor weighs in Defendant's favor. So Defendant's conduct was sufficiently reprehensible to warrant punitive damages, which favors upholding the jury's award.

### b. Ratio

The second guidepost is the ratio of punitive damages to actual harm inflicted on Plaintiff. The Supreme Court has "decline[d] . . . to impose a bright-line ratio which a punitive damages award cannot

exceed." *State Farm*, 538 U.S. at 425. The Supreme Court has said, however, that "[o]ur jurisprudence and the principles it has now established demonstrate . . . that, in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process." *Id*. "As a rule of thumb, 'a 4:1 ratio will typically be close to the line of constitutional propriety and [] few awards exceeding a single-digit ratio to a significant degree will satisfy due process.'" *Rubinstein*, 38 F.4th at 998–99 (quoting *Williams*, 947 F.3d at 763). These "suggested ratios," however, "were intended to be 'instructive,'" and "'[t]he precise award in any case . . . must be based upon the facts and circumstances of the defendant's conduct and the harm to the plaintiff.'" *McGinnis v. Am. Home Mortg. Servicing, Inc.*, 901 F.3d 1282, 1290 (11th Cir. 2018) (quoting *State Farm*, 538 U.S. at 425).

The Court considers whether the ratio of punitive damages to compensatory damages awarded by the jury here—7.69:1—is unconstitutionally excessive. Although the ratio is outside the 4:1 range considered "close to the line" of constitutional impropriety, it does not exceed a single-digit ratio "more likely to comport with due process."

*State Farm*, 538 U.S. at 425.   Defendant seizes on language in *State Farm*, which says that when "compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee." *Id.*  In its view, the $300,000 compensatory damages award is substantial, such that punitive damages should be capped at that amount.   (Dkt. 219-1 at 12–13.)  The Court is unpersuaded.  As an initial matter, the Eleventh Circuit has characterized the language Defendant relies on as dicta.  *See McGinnis*, 901 F.3d at 1290.  But even if it were not, the very next sentence of *State Farm* says the precise award in each case "must be based upon the facts and circumstances of the defendant's conduct and the harm to the plaintiff." *State Farm*, 538 U.S. at 425.  In the light of the reprehensible facts and circumstances of this case noted above, the Court believes the ratio here is proper.  Beyond that, requiring a 1:1 ratio whenever a defendant asserts that the compensatory damages are "substantial" would impose a "bright-line ratio" that the Supreme Court has expressly declined to adopt.  *Id.*  Defendant otherwise points to no Supreme Court or Eleventh Circuit case disapproving of a single-digit ratio between punitive and compensatory damages, and the Court

declines to extend the law here.  Given the extreme conduct at issue in this case, the Court concludes the ratio resulting from the jury's punitive damages award is not constitutionally excessive.

### c. Civil Penalties in Comparable Cases

The third *Gore* guidepost—civil penalties in similar cases—"considers the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases[.]" *Cote*, 985 F.3d at 849–50 (quotation marks omitted).  This factor is "accorded less weight . . . than the first two guideposts." *Id.* at 850 (quotation marks omitted).  The rationale for this guidepost is that a defendant may lack "adequate notice that its conduct could subject it to" a particular punitive damages award "if the difference between the civil or criminal penalties that were or could have been imposed and the punitive damage award is too great." *Johansen*, 170 F.3d at 1336–37.

Defendant asks the Court to compare the punitive damages award to the statutory cap of $100,000 for compensatory and punitive damages under Title VII.  *See* 42 U.S.C. § 1981a(b)(3).  (Dkts. 203 at 15–16; 219-1 at 16–17.)  The Court will not apply the Title VII cap by analogy to employment discrimination cases under § 1981.  *See Swinton v. Potomac*

51

*Corp.*, 270 F.3d 794, 820 (9th Cir. 2001) (observing that, unlike Title VII, "Congress has not seen fit to impose any recovery caps in cases under § 1981 (or § 1983), although it has had ample opportunity to do so since the 1991 amendments to Title VII"). Furthermore, although the punitive damages awarded here are more than the damages available under Title VII for analogous conduct, the difference is not enough, by itself, to suggest that the punitive damages award violates due process. *Cf. State Farm*, 538 U.S. at 428 (finding the most relevant civil sanction to be $10,000, "an amount dwarfed by the $145 million punitive damage award."). Applying the *Gore* guideposts to the facts in this case, the Court concludes the punitive damages against Defendant are not so excessive as to violate due process.

## II. Conclusion

The Court **DENIES** Defendant's Consolidated Post-Trial Motions. (Dkt. 175.)

**SO ORDERED** this 10th day of July, 2024.

MICHAEL L. BROWN
UNITED STATES DISTRICT JUDGE